UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

LANA STEVENS                              CIVIL ACTION NO. 6:15-cv-02560

VERSUS                                    JUDGE DOHERTY

U.S. COMMISSIONER,                        MAGISTRATE JUDGE HANNA
SOCIAL SECURITY
ADMINISTRATION

## REPORT  AND  RECOMMENDATION

Before the Court is an appeal of the Commissioner's finding of non-disability.

Considering the administrative record, the briefs of the parties, and the applicable

law, it is recommended that the Commissioner's decision be reversed and remanded

for further administrative action.

### ADMINISTRATIVE  PROCEEDINGS

The claimant, Lana Stevens, fully exhausted her administrative remedies before

filing this action in federal court.  The claimant filed an application for disability

insurance benefits ("DIB"), alleging disability beginning on June 5, 2010.[1]  Her

application was denied.[2]  The claimant requested a hearing,[3] which was held on June

---

[1]     Rec. Doc. 7-1 at 123.

[2]     Rec. Doc. 7-1 at 68.

[3]     Rec. Doc. 7-1 at 81.

5, 2014 before Administrative Law Judge Nancy M. Pizzo.[4]  The ALJ issued a

decision on August 15, 2014,[5] concluding that the claimant was not disabled within

the meaning of the Social Security Act from June 5, 2010 through the date of the

decision.  The claimant asked for review of the decision, but the Appeals Council

concluded that no basis existed for review of the ALJ's decision.[6]  Therefore, the

ALJ's decision became the final decision of the Commissioner for the purpose of the

Court's review pursuant to 42 U.S.C. § 405(g).  The claimant then filed this action

seeking review of the Commissioner's decision.

## SUMMARY OF PERTINENT FACTS

The claimant was born on July 25, 1955.[7]  At the time of the ALJ's decision,

she was fifty-nine years old.  She graduated from high school,[8] and has relevant work

experience as a receptionist in a medical office.[9]  She alleges that she has been

disabled since June 5, 2010[10] due to fibromyalgia, arthritis, stomach problems,

---

[4]     The hearing transcript is found at Rec. Doc. 7-1 at 32-57.

[5]     Rec. Doc. 7-1 at 18-26.

[6]     Rec. Doc. 7-1 at 4.

[7]     Rec. Doc. 7-1 at 123.

[8]     Rec. Doc. 7-1 at 34.

[9]     Rec. Doc. 7-1 at 34, 148.

[10]    Rec. Doc. 7-1 at 123.

cholesterol, high blood pressure, back pain, and neck pain.[11]  The record contains voluminous medical records, but only the notes pertaining to illnesses claimed to be disabling will be summarized here.

In 2005 and 2006, Ms. Stevens treated at the North Georgia Rheumatology Group, PC.  On April 15, 2005,[12] radiologic examination showed carpometacarpal osteoarthritis and degenerative joint disease ("CMC DJD") in her right hand, CMC DJD and osteopenia (decreased bone density) in her left hand, osteopenia in her lumbar spine, acetabular sclerosis (abnormal hardening of the joint between the femur and the hip) in both hips, and sclerosis (abnormal hardening of tissue) in the left and right sacroiliac joints.  On October 10, 2005,[13] her physician listed her active problems as seronegative inflammatory arthritis vs. rheumatoid arthritis, Sjogrens syndrome, osteoarthritis, enthesopathy (a disorder of a tendon or ligament), tendonitis and weakness in her hands and wrists, ligamentous injury, and diabetes mellitus.  Her doctor recommended twenty to sixty minutes of regular exercise three to five times per week and he also recommended scheduled rest periods of forty-five to sixty

---

[11]     Rec. Doc. 7-1 at 418.

[12]     Rec. Doc. 7-1 at 355.

[13]     Rec. Doc. 7-1 at 360-364.

minutes at a time on an undisclosed schedule.[14]  She was then taking Diclofenac, Evovax, Durabac, Levothroxine, Zocor, Wellbutrin, Ziac, Glucophage, Flexeril, Ultram, Prevacid, Vivelle, Vitamin E, Trazodone, and Ultracet.[15]

On May 26, 2009,[16] Ms. Stevens was seen at the Leonard J. Chabert Medical Center ("Chabert") in Houma, Louisiana, for abdominal pain and weight loss.  On June 11, 2009,[17] she was seen at a clinic run by The Teche Action Board, Inc. ("Teche") for complaints of fatigue, abdominal discomfort, and weakness.  The doctor's assessment included fatigue, history of irritable bowel syndrome, diabetes, hypertension, fibromyalgia, and degenerative joint disease.  On July 8, 2009, she had a normal colonoscopy.[18]  She returned to Teche on August 21, 2009,[19] for a medication refill and complaints of left elbow pain.  Her medication was adjusted.  On December 5, 2009,[20] she was seen at Teche with complaints of muscle spasms on

---

[14]     Rec. Doc. 7-1 at 353.

[15]     Rec. Doc. 7-1 at 361.

[16]     Rec. Doc. 7-1 at 192.

[17]     Rec. Doc. 7-1 at 245.

[18]     Rec. Doc. 7-1 at 235.

[19]     Rec. Doc. 7-1 at 251.

[20]     Rec. Doc. 7-1 at 247.

the left side of her neck, shoulder, and down the left arm.  She was given a Toradol injection and a Valium prescription.

On July 28, 2010,[21] Ms. Stevens was seen at the Teche clinic in Franklin, Louisiana for follow-up of Type II diabetes, hypertension, and degenerative joint disease.  She complained of sleeping too much and chronic neck and back pain.  She reported a history of fibromyalgia.  Her diagnoses were gastroesophageal reflux disease ("GERD"), hypertension, hyperthyroidism, diabetes mellitus, fibromyalgia, and osteaoarthrosis involving multiple sites.  She was given Depo Medrol and Toradol injections.  She was prescribed Bupropion, Cyclobenzaprine, Loratadine, Meloxicam, Metformin, and Trazodone.

On November 1, 2010, Ms. Stevens returned to Teche for a follow up visit,[22] and on January 20, 2011, she was seen again at Teche[23] for trouble swallowing and a choking sensation in her throat.  She was prescribed Celebrex, Diazepam, Hydrocodone, and Synthroid.  She returned to Teche on February 15, 2001.[24]  Lab tests were ordered, and "long-term (current) use of other medications" was added to

---

[21]     Rec. Doc. 7-1 at 252.

[22]     Rec. Doc. 7-1 at 259-261.

[23]     Rec. Doc. 7-1 at 262-264.

[24]     Rec. Doc. 7-1 at 265-269.

her list of diagnoses.  When Ms. Stevens returned to Teche on April 6, 2011,[25] her only remarkable complaint was fatigue, and her medications were adjusted.  On April 27, 2011,[26] she was again seen at the Teche clinic.  She complained of two to three weeks of moderate to severe epigastric pain and reported a history of H. pylori infection.  She was advised to monitor her diet and stop taking Nexium; antibiotics were prescribed.  She returned to the clinic on May 17, 2011,[27] complaining of continued epigastric pain with nausea, vomiting, and diarrhea.  The following diagnoses were added:  pain – abdominal epigastric, peptic ulcer, and gastritis and duodenitis.  Lomotil and phenergan were prescribed.

On May 27, 2011, Ms. Stevens was seen in the emergency department at Chabert complaining of epigastric pain.[28]  The treatment note indicates that she had a long history of ulcers.  CT examination of her abdomen showed a small hiatal hernia and left renal cysts.[29]  Laboratory results dated May 31, 2011 showed an

---

[25]     Rec. Doc. 7-1 at 268-271.

[26]     Rec. Doc. 7-1 at 272-274.

[27]     Rec. Doc. 7-1 at 275-277.

[28]     Rec. Doc. 7-1 at 209-212.

[29]     Rec. Doc. 7-1 at 213-214.

increased number of white blood cells and anemia.[30]  Ms. Stevens followed up at Teche on June 6, 2011,[31] and was prescribed a painkiller.

On June 23, 2011, Ms. Stevens saw a doctor in the gastroenterology/hepatology clinic at Chabert with regard to her epigastric pain.  The doctor's assessment was epigastric pain, reflux, and an abnormal CT.  Laboratory studies were ordered.

Three days later, Ms. Stevens was seen in the emergency department at Chabert, complaining of mid-epigastric pain with diarrhea, weakness, and dizziness. The diagnosis was mid-epigastric pain likely due to GERD in context of hiatal hernia. She was already taking Pepcid and omeprazole.  She was prescribed Sucralfate to be taken before meals.

Ms. Stevens returned to the Teche clinic on August 1, 2011 for a follow up visit.[32]  On October 14, 2011,[33] she underwent an upper endoscopy procedure, which showed moderate atrophic gastritis in her stomach.  Her stomach was biopsied to test for H. pylori.  Several polyps were observed in the stomach, and dilated lacteals (lymphatic vessels) were found in the duodenum.

---

[30]     Rec. Doc. 7-1 at 222-225.

[31]     Rec. Doc. 7-1 at 278-279.

[32]     Rec. Doc. 7-1 at 284-286.

[33]     Rec. Doc. 7-1 at 231-234.

On October 20, 2011,[34] Ms. Stevens returned to the Teche clinic, complaining of chronic bone, joint, and muscle pain and requesting a rheumatology followup.

On February 19, 2012, she was seen in the emergency department at Chabert, complaining of generalized body aches and right upper quadrant abdominal pain. She was advised to see her rheumatologist as scheduled, and she was referred for a hepatobiliary scan. The diagnoses assigned were polymyalgia and right upper quadrant abdominal pain.

Ms. Stevens was seen in Chabert's rheumatology clinic on March 8, 2012,[35] complaining of joint and muscle pain "everywhere." She denied inflammation or trauma, and reported moderate relief from Ultram, Flexeril, and Lortab. She was taking Valium as needed, and she was no longer taking NSAIDs due to chronic gastritis. Her insomnia was reportedly relieved with Trazadone. She told the doctor that she had been unable to work for a year and half. She was diagnosed with fibromyalgia and osteoarthritis. Neurontin was started, Flexeril was continued, and she was to de-escalate opioids.

---

[34]     Rec. Doc. 7-1 at 287-289.

[35]     Rec. Doc. 7-1 at 188-189.

-8-

Ms. Stevens was seen at the Teche clinic on May 1, 2012.[36] She continued to complain of severe pain and was unable to take Neurontin because it made her dizzy. Lyrica was substituted.  She returned on June 11, 2012,[37] again complaining of moderate to severe pain in all joints.  She was referred to the rheumatology clinic at New Orleans's Charity Hospital.  On June 16, 2012, Ms. Stevens was seen in the emergency department at Chabert.[38] She complained of a mid back pain shooting down her left leg, which she described as a shocking pain that she rated an eight on a scale of one to ten.  A chest x-ray showed no active disease.  She was advised to continue taking Tramadol, Lyrica, and Nexium and to follow up with her primary care physician.  On June 20, 2012, she was seen at the Teche clinic.[39] She complained of pain "all over" and rated it a seven to eight on a scale of one to ten.  Hydrocodone was prescribed.

On September 14, 2012, Ms. Stevens again visited Teche.[40] The treatment note indicates that she received nonspecific abnormal results of a function study of the liver.  On September 20, 2012, she returned, again complaining of chronic pain that

---

[36]     Rec. Doc. 7-1 at 300-302.

[37]     Rec. Doc. 7-1 at 303-305.

[38]     Rec. Doc. 7-1 at 197-200.

[39]     Rec. Doc. 7-1 at 306-308.

[40]     Rec. Doc. 7-1 at 309-314.

she rated as seven to eight on a ten-point scale.[41]  A consultation in the rheumatology clinic at University Medical Center ("UMC") was requested due to chronic pain from fibromyalgia and failed conservative treatment.

Ms. Stevens was seen in Chabert's emergency department on November 9, 2012,[42] complaining of low back pain radiating bilaterally to her hips and urinary urgency.  She was discharged with advice to continue her current medications.

She was then seen at UMC on November 25, 2012.[43]  She was tender in eleven out of eighteen trigger points.  The treatment note indicates that UMC's rheumatology clinic no longer treats fibromyalgia.  It was recommended that the claimaint visit a pain management clinic.  Uncontrolled hypothyroidism was noted.  She was taking Synthroid with Nexium, and was advised to take it on an empty stomach.  The doctor indicated that her symptoms of fatigue and pain could be due to hypothyroidism.  She was to follow up with her primary care physician.

---

[41]     Rec. Doc. 7-1 at 315-317.

[42]     Rec. Doc. 7-1 at 193-196.

[43]     Rec. Doc. 7-1 at 238-239.

On December 20, 2012, Ms. Stevens was seen at the Teche clinic for medication refills.[44]  She had been taking Lortab for the past year and was awaiting an appointment with pain management.  She rated her pain as three to four out of ten.

Ms. Stevens followed up at the Teche clinic on January 10, 2013.[45]  She saw Dr. Chatsu Guatam and indicated that she had experienced no improvement since her last visit.  The treatment note states that she was taking Valium, Cyclobenzaprine, Lortab, and Tramadol.  The doctor stated, "I told the patient that I can not justify using so many sedatives and hypnotics[.]  I will try to control the pain with Tramadol Two BID and Lortab for breakthrough pain[.]  I will give only 30 tablets that should last 4 months[.]  I will stop Valium and continue with Cyclobenzaprine."  Ms. Stevens was scheduled to see a physical therapist.

On February 26, 2013, Ms. Stevens was seen in the emergency department at Chabert,[46] complaining of headache, chest tightness, and jaw pain.  She described her her pain level as ten out of ten.  A chest x-ray showed no acute cardiopulmonary disease.  She was given morphine and phenergan, and her pain decreased to a two out of ten.  The physician opined that her pain was likely from gastritis.

---

[44]    Rec. Doc. 7-1 at 318-320.

[45]    Rec. Doc. 7-1 at 332-334.

[46]    Rec. Doc. 7-1 at 326-329.

On March 15, 2013, Ms. Stevens was seen at Teche[47] for a headache that she rated at five to six on a ten-point scale.  She was prescribed Cyclobenzaprine (for muscle spasms), Floricet (for headache), and Promethazine (for nausea and vomiting).

On March 23, 2013, Ms. Stevens was examined by Dr. Jacques Courseault at the request of Disability Determination Services.[48]  She reported that she was diagnosed with fibromyalgia in 1995, has multiple areas of pain in her neck and back associated with insomnia and fatigue, and gets minimal relief with Lyrica.  She reported that she has arthritis in multiple joints, described her pain as dull and achy, and rated it at eight out of ten.[49]  She provided a history of stomach problems, including a small hiatal hernia and chronic gastritis with occasional nausea and vomiting, and "good benefit" from medication.  She gave a history of high cholesterol that was improved with medication and dietary changes, and a history of high blood pressure, well controlled with medication.  She complained of dull, achy back and neck pain without radiation that she rated ten out of ten.  She stated that the low back pain was particularly worse with prolonged sitting.  Ms. Stevens told Dr. Courseault that she could walk and sit for thirty minutes at a time.  She listed sixteen prescription

---

[47]     Rec. Doc. 7-1 at 336-338.

[48]     Rec. Doc. 7-1 at 340-345.

[49]     Dr. Courseault's report actually states: "Describes 8/20 dull achy pain."  This Court assumes that this was a typographical error, and the claimant described her pain as 8/10.

-12-

medications that she was then taking.  Dr. Courseault's examination showed that the claimant was tender to palpation at the right sacroiliac joint, with a positive Faber test and negative straight leg raise.  She was also tender to palpation at the cervical paraspinals, with negative Spurling's sign and negative Tinel's sign.  There was no muscle asymmetry, atrophy, or involuntary movements, no heat, and no swelling.  She was able to rise from a sitting position without assistance, stand on tiptoes, and heel and tandem walk without problems.  She could bend and squat without difficulty. She had 5/5 grip strength, no abnormal reflexes, and a normal range of motion in all joints.  Imaging of her cervical spine showed straightening of the normal cervical lordosis, no acute fractures or dislocations, and normal disc space heights.  Imaging showed a normal lumbar spine. Dr. Courseault diagnosed sacroiliac joint dysfunction on the right, cervical myofascial versus facetogenic pain, hiatal hernia, high blood pressure, high cholesterol, and fibromyalgia.  In his opinion, Ms. Stevens "should be allowed to alternate sitting and standing as needed to relieve SIJ pain.  She should be able to walk, and/or stand for a full workday, lift/carry objects without limitations, hold a conversation, respond appropriately to questions, carry out and remember instructions."  He recommended physical therapy and/or pain management to help decrease her pain and increase her functionality.  There is no evidence of physical

therapy in the record, and Ms. Stevens stated at the hearing that she had not had physical therapy in the last four years, i.e., from 2010 to 2014.[50]

On July 10, 2013,[51] Ms. Stevens was seen in the physical medicine and rehabilitation clinic at Chabert.  She complained of pain rated eight to ten on a ten-point scale in her neck, shoulders, and back.  She also complained that her knees gave out.  She described her pain as chronic and reported that she has fibromyalgia.  Upon examination, the doctor found a full range of motion in her lumbar spine, cervical spine, and knees.  Her strength was 5/5 in both upper extremities and in both lower extremities.  She had tenderness at sixteen of eighteen trigger points.  An MRI of the lumbar spine from June 2013 was within normal limits.  The plan was to discuss sleep hygiene and an exercise regimen with daily stretching, continue current medications, obtain x-rays of both knees, and have the claimant return in nine months.  The knee x-rays showed a normal left knee and minimal spurring along the tibial spine of the right knee without acute changes.[52]

---

[50]      Rec. Doc. 7-1 at 42.

[51]      Rec. Doc. 7-1 at 394-395.

[52]      Rec. Doc. 7-1 at 398-399.

-14-

On July 26, 2013, Ms. Stevens was seen in the urology clinic at Chabert for urinary frequency.[53]  She was prescribed Oxybutynin and advised to return in three months if she was still having problems.

Dr. Gautum ordered x-rays of Ms. Stevens's cervical spine, which were obtained on August 2, 2013.[54]  The studies showed straightening of the C-spine that was possibly positional or possibly the result of spasm as well as degenerative changes of the lower C-spine with spurring anteriorly at C5-C7 plus mild posterior spondylosis at the same levels.  Impingement on the spinal canal was not ruled out.

Ms. Stevens followed up in Chabert's urology clinic on October 25, 2013.[55]  She gave a history of having had bladder urgency for twenty years.  She also stated that she had pain all over her body that she rated as a four on a scale of one to ten.  She was diagnosed with atrophic vaginitis, for which water-based lubrication was prescribed, and bladder urgency, for which she was to continue her medication.

On November 14, 2013, the claimant returned to the urology clinic for cystoscopy.[56]  She was diagnosed with mixed urinary incontinence and atrophic

---

[53]     Rec. Doc. 7-1 at 391-393.

[54]     Rec. Doc. 7-1 at 400.

[55]     Rec. Doc. 7-1 at 389-390.

[56]     Rec. Doc. 7-1 at 385-388.

vaginitis.  She was prescribed medications for both conditions and scheduled for a surgical procedure for stress incontinence on December 18, 2013.  She had a pre-surgical visit at the clinic on December 10, 2013.[57]  The procedure – called a mid urethral sling procedure, a transobturator tape placement, or a TOT procedure – was performed on December 18, 2013.[58]  The claimant's post-operative visit in the urology clinic was on January 21, 2014.[59]

On February 28, 2014,[60] the claimant's thoracic spine was x-rayed, revealing minimal degenerative spurring along the vertebral bodies in the mid thoracic spine but no acute changes.

On March 19, 2014,[61] Ms. Stevens was seen in the Women's Clinic at Chabert. She reported multiple issues since the recent surgery.  The physician's assessment was atrophic vaginitis and decreased libido.  She was advised to continue care with the urology clinic and to return in three months.  Premarin cream was prescribed.

---

[57]     Rec. Doc. 7-1 at 384.

[58]     Rec. Doc. 7-1 at 365-369, 371-372, 396-397.

[59]     Rec. Doc. 7-1 at 382-383.

[60]     Rec. Doc. 7-1 at 401.

[61]     Rec. Doc. 7-1 at 380-381.

On April 3, 2014, Ms. Stevens was seen at Chabert's rheumatology clinic upon referral from the emergency department.[62]  She had been discharged from the ER with pain medications following a cervical x-ray.  She reported diffuse joint pain in the morning and generalized tenderness, but she denied falls, trauma, numbness, or tingling.  It was noted that her complaints were very dramatic and she appeared to be seeking pain medication.  Upon examination, she was tender to palpation at C3-C4, had 4/5 strength in her upper and lower limbs, and her deep tendon reflexes were +2, with no edema.  Her Lyrica dosage was increased, her other medications were continued, and she was advised to exercise.

Ms. Stevens was seen in Chabert's physical medicine and rehabilitation clinic on April 10, 2014.[63]  She complained of head to toe pain that she rated an eight on a scale of one to ten.  She reported that her pain had gotten worse.  She was given Kenalog injections in both sacroiliac joints and trigger point injections in her bilateral trapezius muscles.  Tizanide was added to her medications, she was educated on the use of a TENS unit, x-rays of her chest, hands, and wrists were ordered, and she was advised to return in nine months.  The x-rays of her hands were normal.[64]  A bone

---

[62]    Rec. Doc. 7-1 at 378-379.

[63]    Rec. Doc. 7-1 at 375-377.

[64]    Rec. Doc. 7-1 at 405-406.

mineral density test showed minimal osteopenia of the lumbar spine and both femoral neck regions.[65]

Ms. Stevens followed up in the urology clinic at Chabert on April 22, 2014.[66] She reported extreme urgency and incontinence.  Her Oxybutinin prescription was continued, and she was advised to return in two months.

On June 5, 2014, Ms. Stevens testified at a hearing regarding her symptoms and her medical treatment.  She stated that she last worked in June 2010 as a receptionist and "was not able to sit all day" due to back and neck pain.[67]  However, she also stated that no doctor has ever told her that she should not be working.[68]

## ANALYSIS

### A.   STANDARD OF REVIEW

Judicial review of the Commissioner's denial of disability benefits is limited to determining whether substantial evidence supports the decision and whether the proper legal standards were used in evaluating the evidence.[69]  "Substantial evidence

---

[65]    Rec. Doc. 7-1 at 404.

[66]    Rec. Doc. 7-1 at 373-374.

[67]    Rec. Doc. 7-1 at 34, 35-36.

[68]    Rec. Doc. 7-1 at 36.

[69]    *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995).

is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[70]  Substantial evidence "must do more than create a suspicion of the existence of the fact to be established, but 'no substantial evidence' will only be found when there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'"[71]

If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed.[72]  In reviewing the Commissioner's findings, a court must carefully examine the entire record, but refrain from re-weighing the evidence or substituting its judgment for that of the Commissioner.[73]  Conflicts in the evidence[74] and credibility assessments[75] are for the Commissioner to resolve, not the courts.  Four elements of proof are weighed by the courts in determining if substantial evidence supports the Commissioner's determination:  (1) objective medical facts, (2) diagnoses and opinions of treating and examining physicians, (3) the claimant's

---

[70]     *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983).

[71]     *Hames v. Heckler*, 707 F.2d at 164 (citations omitted).

[72]     42 U.S.C. § 405(g); *Martinez v. Chater*, 64 F.3d at 173.

[73]     *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988); *Villa v. Sullivan*, 895 F.2d at 1022.

[74]     *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985).

[75]     *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991).

subjective evidence of pain and disability, and (4) the claimant's age, education and work experience.[76]

## B.   ENTITLEMENT TO BENEFITS

The Disability Insurance Benefit ("DIB") program provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence.[77]  A person is disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."[78]  A claimant is disabled only if his physical or mental impairment or impairments are so severe that he is unable to not only do his previous work, but cannot, considering his age, education, and work experience, participate in any other kind of substantial gainful work which exists in significant numbers in the national economy, regardless of whether such work exists in the area in which the claimant

---

[76]    *Wren v. Sullivan*, 925 F.2d at 126.

[77]    See 42 U.S.C. § 423(a).

[78]    42 U.S.C. § 1382c(a)(3)(A).

-20-

lives, whether a specific job vacancy exists, or whether the claimant would be hired if he applied for work.[79]

## C.   EVALUATION PROCESS AND BURDEN OF PROOF

The Commissioner uses a sequential five-step inquiry to determine whether a claimant is disabled.  This process requires the ALJ to determine whether the claimant (1) is currently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) is able to do the kind of work he did in the past; and (5) can perform any other work at step five.[80]  "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis."[81]

Before going from step three to step four, the Commissioner assesses the claimant's residual functional capacity[82] by determining the most the claimant can still do despite his physical and mental limitations based on all relevant evidence in the record.[83]  The claimant's residual functional capacity is used at the fourth step to

---

[79]      42 U.S.C. § 1382c(a)(3)(B).

[80]      20 C.F.R. § 404.1520.

[81]      *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), cert. den. 914 U.S. 1120 (1995) (quoting *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987)).

[82]      20 C.F.R. § 404.1520(a)(4).

[83]      20 C.F.R. § 404.1545(a)(1).

determine if he can still do his past relevant work and at the fifth step to determine whether he can adjust to any other type of work.[84]

The claimant bears the burden of proof on the first four steps; at the fifth step, however, the Commissioner bears the burden of showing that the claimant can perform other substantial work in the national economy.[85]  This burden may be satisfied by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence.[86]  If the Commissioner makes the necessary showing at step five, the burden shifts back to the claimant to rebut this finding.[87]  If the Commissioner determines that the claimant is disabled or not disabled at any step, the analysis ends.[88]

---

[84]    20 C.F.R. § 404.1520(e).

[85]    *Graves v. Colvin*, 837 F.3d 589, 592 (5th Cir. 2016); *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994).

[86]    *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

[87]    *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005); *Fraga v. Bowen*, 810 F.2d at 1302.

[88]    *Greenspan v. Shalala*, 38 F.3d at 236.

## D.    THE ALJ'S FINDINGS AND CONCLUSIONS

In this case, the ALJ determined, at step one, that the claimant has not engaged in substantial gainful activity since June 5, 2010.[89]  This finding is supported by substantial evidence in the record.

At step two, the ALJ found that the claimant has the following severe impairments:  fibromyalgia, osteoarthrosis, diabetes, and depression.[90]  This finding is supported by substantial evidence in the record.

At step three, the ALJ found that the claimant has no impairment or combination of impairments that meets or medically equals the severity of a listed impairment.[91]  The claimant challenges this finding.

The ALJ found that the claimant has the residual functional capacity to perform light work except for the following:  no climbing ladders, ropes, or scaffolds; occasional climbing of rams and stairs; occasional balancing, stooping, kneeling, crouching, crawling; would need to avoid concentrated exposure to extreme heat; no work at heights or with dangerous, hazardous machinery; would need to alternate positions every hour for five minutes while remaining on task; would need access to

---

[89]    Rec. Doc. 7-1 at 20.

[90]    Rec. Doc. 7-1 at 20.

[91]    Rec. Doc. 7-1 at 21.

a restroom; would need routine workplace changes and no fast-paced production requirements.[92]

At step four, the ALJ found that the claimant is capable of performing her past relevant work as a receptionist.[93]  Having made a decision of no disability at step four, the ALJ did not proceed to step five.  The ALJ found that the claimant was not disabled from June 5, 2010 (the alleged disability onset date) through August 15, 2014 (the date of the decision).[94]  The claimant challenges this finding.

## E.   THE ALLEGATIONS OF ERROR

Ms. Stevens claims that the ALJ erred (1) in concluding that Ms. Stevens could perform sedentary work; (2) in failing to find that Ms. Stevens's persistent incontinence is not a severe impairment; (3) in failing to find that the claimant's fibromyalgia does not meet or equal a listing; (4) in failing to evaluate the claim in accordance with SSR 12-2P, and (5) in applying an improper "pick and choose" evaluation of the evidence.

---

[92]   Rec. Doc. 7-1 at 22.

[93]   Rec. Doc. 7-1 at 26.

[94]   Rec. Doc. 7-1 at 26.

## F.  DID THE ALJ ERR IN EVALUATING THE CLAIMANT'S RESIDUAL FUNCTIONAL CAPACITY?

The ALJ found that Ms. Stevens retains the residual functional capacity to perform light work, but with several noted exceptions to the full range of work at that level.  For example, she must have access to a restroom due to her nonsevere urinary impairment.  The ALJ also found that Ms. Stevens is capable of performing her prior work as a receptionist.  At the hearing, Ms. Stevens testified that, in her last job as a receptionist, she was required to sit for eight or nine hours per day.[95]  Thus, her job was sedentary in nature since the regulations define sedentary work as requiring only occasional walking and standing.[96]  If someone can do light work, they are also able to do sedentary work, "unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time."[97]  In this case, there is no issue regarding Ms. Stevens's dexterity, but she argues that her inability to sit for a long time without pain precludes her from performing her past work as a receptionist and demonstrates that the ALJ's finding that she can perform light work – or sedentary work – is erroneous.

---

[95]     Rec. Doc. 7-1 at 34.

[96]     20 C.F.R. § 404.1567(a).

[97]     20 C.F.R. § 404.1567(b).

In evaluating the claimant's residual functional capacity, the ALJ recognized Ms. Stevens's complaint that back pain prevents her from sitting for prolonged periods.  This is evidenced by the ALJ's conditioning her finding that Ms. Stevens can do light work on her being able "to alternate positions every hour for five minutes while remaining on task."  However, the ALJ did not explain why she included this particular limitation in her residual functional capacity finding.

Ms. Stevens testified that no doctor has told her she cannot work, and the treatment notes in the record do not contain functional evaluations by any of Ms. Stevens's treating physicians.  The record contains no indication that any doctor at North Georgia Rheumatology Group, Chabert, Teche, or UMC has limited Ms. Stevens's activities in any way or opined as to how much activity she is capable of. The examining consultant, Dr. Courseault, however, did analyze Ms. Stevens's functionality.  In his opinion, she was able to work if she was "allowed to alternate sitting and standing as needed."  The ALJ gave great weight to Dr. Courseault's opinions.[98]  But she did not incorporate in her residual functional capacity finding the limitation that Dr. Courseault found to be necessary.  Instead, she changed his recommendation without providing an evidentiary basis for doing so.  This was error.

---

[98]     Rec. Doc. 7-1 at 25.

Dr. Courseault opined that Ms. Stevens should alternate sitting and standing at will.  This is inconsistent with the Commissioner's finding that Ms. Stevens should be permitted to alternate positions every hour for five minutes.  Alternating positions is not the same thing as alternating sitting and standing; further, alternating positions every hour for five minutes is not the same as changing from sitting to standing as needed.  The ALJ did not incorporate Dr. Courseault's recommendation nor did she explain why she deviated from his recommendation.  This is important because "an ALJ may not rely on his own unsupported opinion as to the limitations presented by the applicant's medical conditions."[99]  The ALJ established a limitation on the claimant's ability to perform the full range of light work without any medical evidence or opinion to support the limitation.  The ALJ then used the unsupported limitation to reach a residual functional capacity finding based upon her own interpretation of the claimant's ability to work.  This process produced an improper residual functional capacity finding.  Additionally, the ALJ failed to satisfy her affirmative duty "to ensure that [her] decision is an informed decision based upon

---

[99]     *Williams v. Astrue*, 355 Fed. App'x 828, 832, n.6 (5th Cir. 2009) (per curiam) (citing *Ripley v. Chater*, 67 F.3d 552, 557-58 (5th Cir. 1995)) ("In *Ripley*, we held that an ALJ may not – without opinions from medical experts – derive the applicant's [RFC] based solely on the evidence of [the applicant's] claimed medical conditions.  Thus, an ALJ may not rely on his own unsupported opinion as to the limitations presented by the applicant's medical conditions.").

sufficient facts."[100]  Finally, having to alternate between sitting and standing in order to work the entire day does not fit within the definition of sedentary work;[101] accordingly, it cannot fit within in the definition of light work.  The ALJ's conclusion concerning Ms. Stevens's residual functional capacity was not supported by substantial evidence, and this matter should be remanded for a proper analysis of the plaintiff's vocationally-relevant functional limitations.

**G.**   **DID THE ALJ ERR IN FAILING TO FIND THAT THE CLAIMANT'S INCONTINENCE IS NOT A SEVERE IMPAIRMENT?**

The claimant did not identify incontinence as a disabling condition at the time she filed her application for Social Security benefits.  She testified at the hearing that she had bladder surgery in 1990, that her symptoms worsened over time, that she had surgery again in December 2013, and that her symptoms were worse after the second surgery than they were before that procedure.[102]  She also stated that she has had significant urine leakage, sometimes necessitating that she change clothes a couple of times per day even when wearing a pad, since the recent surgery.[103]

---

[100]   *Brock v. Chater*, 84 F.3d 726, 728 (5th Cir. 1996).

[101]   *Scott v. Shalala*, 30 F.3d 33, 34 (5th Cir. 1994).

[102]   Rec. Doc. 7-1 at 38-39.

[103]   Rec. Doc. 7-1 at 46.

In the Fifth Circuit, an impairment is not severe only if it is a slight abnormality having such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience.[104]  The record contains no evidence that Ms. Stevens sought treatment for a urinary problem between 2005 and July 2013.  At that time, she sought treatment for urinary frequency and was prescribed medication.  At a follow up visit in October 2013,[105] it was noted that her urinary problems were intermittent and infrequent, and she was advised to continue her medication.  At her appointment on December 10, 2013, the claimant reported that the medication provided relief with urgency, but she wanted to proceed with the surgical procedure,[106] which was performed a few days later.  At her first post-operative visit, she reported no bladder leakage with stressors such as coughing and laughing.[107]  In March 2014,[108] the claimant reported to her gynecologist that was "having multiple issues since surgery," but bladder frequency, urgency, and incontinence were not among the problems mentioned in the treatment note.  She was advised to follow up with her urologist.  When she saw the urologist

---

[104]     *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985).

[105]     Rec. Doc. 7-1 at 389.

[106]     Rec. Doc. 7-1 at 384.

[107]     Rec. Doc. 7-1 at 382.

[108]     Rec. Doc. 7-1 at 380-381.

in April 2014, she reported extreme urgency and incontinence, and Oxybutinin was again prescribed.[109]

By her own account, Ms. Stevens worked for a number of years while experiencing urinary problems.  She did not list her urinary impairment among her disabling conditions when she filed her application for benefits.  Her urinary urgency was resolved through the use of medication before the most recent surgery, and her residual urinary complaints were described as infrequent and intermittent, but the claimant decided to go forward with the surgery anyway.  When she again began experiencing urinary urgency and incontinence, her doctor again prescribed the same medication she had been on previously.  Aside from the claimant's own testimony, the record does not reflect whether the medication prescribed in April 2014 again resolved the claimant's urinary complaints.  An impairment that can be remedied or controlled by medication, treatment, or therapy cannot serve as the basis for a finding of disability.[110]  Furthermore, the ALJ's residual functional capacity assessment takes Ms. Stevens's urinary impairment into account by stating that she would need access

---

[109]     Rec. Doc. 7-1 at 373.

[110]     *Johnson v. Bowen*, 864 F.2d 340, 348 (5th Cir. 1988); *Lovelace v. Bowen*, 813 F.2d at 59.

to a restroom.  Accordingly, there is substantial evidence in the record supporting the ALJ's conclusion that the claimant's urinary impairment is not severe.

**H.   DID THE ALJ ERR IN EVALUATING WHETHER THE CLAIMANT'S FIBROMYALGIA MEETS OR EQUALS A LISTING or ERR IN FAILING TO APPLY SSR 12-2P?**

The claimant testified that she was diagnosed with fibromyalgia in 1995, that it caused muscle pain and "brain fog," that she was prescribed Lyrica for this condition, and that the medication did not alleviate her symptoms.[111]  Evidence in the record establishes that the claimant has complained of widespread pain, has been found to have eleven or more painful trigger points, and has been formally diagnosed with fibromyalgia.  However, the ALJ found that while her fibromyalgia is a severe impairment, it does not meet or equal a listing.  The claimant argues that this conclusion was erroneous.  The claimant also argues that the ALJ failed to evaluate her fibromyalgia in accordance with SSR 12-2p.

Fibromyalgia is not a listed impairment.  Therefore, the ALJ did not err in finding that the claimant's fibromyalgia does not meet a listing.  As stated in SSR 12-2p, "FM [fibromyalgia] cannot meet a listing in appendix 1 because FM [fibromyalgia] is not a listed impairment."[112]

---

[111]   Rec. Doc. 7-1 at 37-38.

[112]   SSR 12-2p, 2012 WL 3104869, at *6.

-31-

SSR 12-2p was issued for the purpose of providing guidance for determining whether the evidence establishes a medically determinable impairment of fibromyalgia and for evaluating fibromyalgia in disability claims.[113]  Fibromyalgia can provide the basis for a finding of disability.[114]  Although the cited regulation suggests that evaluating a claimant's fibromyalgia under Listing 14.09(D) for inflammatory arthritis would be a suitable method for determining whether a claimant's fibromyalgia equals a listing, the regulation does not require that fibromyalgia be evaluated only under that listing.  In this case, the ALJ did not evaluate Ms. Stevens's symptoms in light of Listing 14.09(D) but did evaluate them under Listing 1.04 for spine disorders and Listing 1.02 for dysfunction in major joints.  The ALJ also evaluated Ms. Stevens's claimed "brain fog" – which is recognized in SSR 12-2p as "fibro fog" – with regard to Listing 12.04 for mental impairments.  The claimant has the burden of proof at this step of the evaluative process, but she did not identify a specific listing that her fibromyalgia equals or articulate how her fibromyalgia satisfies the criteria of any particular listing. On the other hand, the ALJ properly evaluated the claimant's symptoms under SSR 12-2p. Because the claimant did not carry her burden of proof at this step of the evaluative

---

[113]     SSR 12-2p, 2012 WL 3104869, at *1.

[114]     SSR 12-2p, 2012 WL 3104869, at *2.

process, the ALJ did not err in failing to find that her fibromyalgia does not meet or equal a listed impairment.

## J.   DID THE ALJ ERR IN IMPROPERLY "PICKING AND CHOOSING" THE EVIDENCE?

An ALJ must consider all of the evidence in a case and cannot "pick and choose" only that evidence that supports a finding of nondisability.[115]  The claimant argues that, in this case, the ALJ used "isolated bits of evidence of dubious value [to] discredit the claimant, while a significant body of longitudinal evidence is apparently ignored."[116]  The ALJ's evaluation of the credibility of the claimant's subjective complaints is entitled to deference when it is supported by substantial evidence.[117] Therefore, it appears that the claimant is arguing that the ALJ's credibility evaluation is flawed because it is supported only by isolated pieces of evidence rather than by substantial evidence.

The ALJ's ruling includes a detailed review of the claimant's symptoms and medical treatment.  However, the ALJ did mention, in evaluating the claimant's residual functional capacity, that the claimant had little treatment for her

---

[115]     *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000).

[116]     Rec. Doc. 7-1 at 10.

[117]     *Newton v. Apfel*, 209 F.3d 448, 459 (5th Cir. 2000); *Villa v. Sullivan*, 895 F.2d at 1024.

fibromyalgia, particularly during the time frame when her condition was allegedly worsening; has not always been noncompliant with medication; and cared for triplets while allegedly disabled.[118]

The claimant does not dispute the fact that she had little treatment for fibromyalgia during the period of time when her condition was allegedly worsening or that she cared for her daughter's triplets, but she argues that the instance of noncompliance cited by the ALJ had only to do with blood pressure medication and was unrelated to her fibromyalgia.[119] Although the citation used by the ALJ supports that contention, the ALJ could have cited the fact that physical therapy and pain management have been recommended for the claimant but the record contains no evidence that she has complied with those recommendations.  The ALJ also could have cited to evidence of the claimant's dramatization of her symptoms and suspected drug seeking behavior.  The fact that the ALJ did not cite to those parts of the record demonstrates that the ALJ was not simply looking for evidence to discredit the claimant but was reviewing the entire record with regard to the claimed disability. This Court finds that the referenced evidence identified by the ALJ was not "picking and choosing" parts of the record and ignoring others for the sake of discrediting the

---

[118]     Rec. Doc. 7-1 at 25.

[119]     Rec. Doc. 7-1 at 9.

claimant. Instead, this was identifying relevant portions of the record that inform the severity of the claimant's fibromyalgia and her residual functional capacity.

The ALJ was justified in referencing the portions of the record she cited for three reasons. First, an ALJ may rely on lack of treatment as an indication of non-disability.[120] Thus, the fact that Ms. Stevens had little treatment for her fibromyalgia at relevant time periods is significant.

Second, an impairment that can be remedied or controlled by medication, treatment, or therapy cannot serve as the basis for a finding of disability.[121] Therefore, a claimant's failure to comply with the medication regimen prescribed by his physician is critically important to understanding the extent to which an alleged impairment is actually disabling.

Third, it is not sufficient for a claimant to establish a particular diagnosis in order to be found disabled. In this case, the claimant was diagnosed with fibromyalgia. But a fibromyalgia diagnosis standing alone is not disabling; instead, a claimant must prove that she is functionally impaired by the diagnosed condition.[122] The fact that the claimant was able to assist her daughter in caring for triplets is a fact

---

[120]    *Doss v. Barnhart*, 137 Fed. App'x 689, 690 (5th Cir. 2005); *Villa v. Sullivan*, 895 F.2d at 1024.

[121]    *Johnson v. Bowen*, 864 F.2d at 348; *Lovelace v. Bowen*, 813 F.2d at 59.

[122]    *Hames v. Heckler*, 707 F.2d at 165.

that helps to illuminate her level of functioning.  Thus, it was appropriate for the ALJ to mention the evidence that she relied upon in evaluating the extent that the claimant's fibromyalgia has impacted her ability to work.

In summary, this Court finds that the ALJ did not merely "pick and choose" evidence that was adverse to the claimant in reaching the findings set forth in her ruling.

## CONCLUSION AND RECOMMENDATION

The undersigned finds that the Commissioner's conclusion that the claimant can perform a modified range of light work is not based on substantial evidence in the record.  Accordingly,

This Court recommends that the Commissioner's decision be REVERSED and REMANDED to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g) for reevaluation of the claimant's residual functional capacity.  Inasmuch as the reversal and remand recommended herein falls under sentence four of Section 405(g), any judgment entered in connection herewith will be a "final judgment" for purposes of the Equal Access to Justice Act (EAJA).[123]

---

[123]    See, *Richard v. Sullivan*, 955 F.2d 354 (5th Cir. 1992), and *Shalala v. Schaefer*, 509 U.S. 292 (1993).

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen days from receipt of this report and recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within fourteen days after receipt of a copy of any objections or responses to the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of receipt, or within the time frame authorized by Fed. R. Civ. P. 6(b) shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the district court, except upon grounds of plain error.  See *Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996).

Signed in Lafayette, Louisiana, this 3rd day of January 2017.

_____

PATRICK J. HANNA
UNITED STATES MAGISTRATE JUDGE